### WINCKLER v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. December 11, 1908.)

MUNICIPAL CORPORATIONS (§ 819*)—DEFECTIVE STREETS—INJURIES TO PEDES-
    TRIAN—NEGLIGENCE.

    In an action against a city for injuries to a pedestrian slipping on ice
and snow on a sidewalk, evidence *held* not to show actionable negligence
of the city.

    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
1739; Dec. Dig. § 819.*]

    Patterson, P. J., and McLaughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by Adele Winckler against the City of New York. From
a judgment for plaintiff, and from an order denying a motion for
a new trial, defendant appeals. Reversed, and new trial ordered.

Argued before PATTERSON, P. J., and INGRAHAM, Mc-
LAUGHLIN, CLARKE, and HOUGHTON, JJ.

Theodore Connoly, for appellant.
Edward A. Sumner, for respondent.

INGRAHAM, J. On the evening of February 19, 1905, the plain-
tiff, while walking on the sidewalk on Fifty-Fifth street, between
Eighth avenue and Broadway, in the city of New York, fell and was
injured, for which she has recovered a judgment against the city of
New York. She testified that as she was walking along on the side-
walk she came to an obstruction and slipped and fell; that she noticed
that this obstruction was near a hydrant, and there was an accumula-
tion of snow on the sidewalk; that there were large piles of snow on
both sides of the street; that this obstruction was something hard and
high and was covered with ice; that the heap of snow was very close
to this obstruction; that at the time of the accident the plaintiff was
walking with her two sisters, the three walking abreast, the plaintiff
being nearest the curb. One of plaintiff's sisters testified that, after
the plaintiff fell, she looked to see what caused it; that she saw the
hydrant "and there was snow very high, or snow and gravel stuff, to-
wards the street, near the hydrant, around the hydrant"; that where
plaintiff fell there was a little mound six or eight inches high, and it

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

was covered with ice, and she slipped on that; that this mound was ice capped; that the sidewalk was extremely rough and uneven, and it was slippery on the sidewalk; that towards the gutter the ice part increased, more snow and ice on that side; that the snowfall happened some time previous, and had apparently been removed and the ice patches formed since; that the snow was around the hydrant, and inside, sloping down, and plaintiff fell right near the hydrant; that the mound was a very hard lump, and it had ice on it; that according to her recollection this was in front of a vacant lot in which there had been some excavation; that there were banks of snow four or five feet high that had been formed on the other side of the hydrant as a result of shoveling snow in the street.

The plaintiff then called as a witness a boy about 15 years old at the time of the accident. He testified that he resided at an apartment house near to the place of the accident; that this ice cone where the plaintiff fell was near the hydrant for about a month before the accident occurred; that from Christmas up to the middle of January this condition had continued, when it was called to the attention of a policeman, and he was asked to report it; that he did report it and men came and fixed it about one week before the injury; that the men tore up the street and relaid the stone and fixed the sidewalk, made it even and smooth on the sidewalk and the mound was taken away, but the mound upon which the plaintiff fell came there right after they fixed the street; that the mound formed again after that. The court then adjourned until the following Monday, when this witness was recalled, and to some extent changed his testimony. He then testified that the men only took away a part of the old mound to put the new pieces of flagging in; that this mound was about 2½ feet from the hydrant; that this mound was a gradual elevation and the center part of it might have been eight inches from a level over the side, the edges of it came down even with the sidewalk, sloping down toward the house line, and sloping down east and west, and this mound consisted of snow, ice, and sand and coming up to the highest point was eight inches; that some of the snow came in the recent snowstorms and some of the ice had formed recently, a short time before the accident, from the melting of the snow; that the mound itself was about 2½ feet from the hydrant, and the flag was put in nine inches back of the pump.

Another sister of the plaintiff who was with her at the time of the accident testified that the three sisters were walking together in the middle of the sidewalk when they encountered an accumulation of ice on the sidewalk, when the plaintiff slipped and fell; that the morning after the accident she went back to the place where her sister fell; that the mound was raised a bit from the sidewalk; that the snow which had been removed from the sidewalk had been piled up about the hydrant, and was close against it and all around it; that there was an accumulation, "a frozen mass, ice on top of it, about two and a half feet from the side line of the hydrant"; that the whole sidewalk was covered with flagstones, with ice on top of it; that accumulation of ice spread itself across the whole sidewalk, toward the stoop; that

the accumulation formed this mound in the one place, but it was not quite as high as the other place on the sidewalk as where the plaintiff fell; that the place where the plaintiff fell was the result of the accumulations from time to time, and partly by some of the snow that fell from the street as it was piled up; that the top of it was frozen; that prior to the accident there had been many heavy snowfalls and rainfalls and freezing weather; that "snow fell from the street onto the place where my sister fell, at different times, and that it rained and snowed at various intervals between the time of my sister's injury and a month previous to the accident. I do not know how long prior to my sister's injury was the last storm. The slippery condition was about the same for a month prior to the accident. I do not mean to say I went to this mound every day and tested it to see if it was slippery; not particularly the mound. I am saying the surface was extremely uneven. I am speaking about the slippery condition of it, the snow and ice element was there. I passed it every day."

The janitress of the apartment house testified that for a month or two before the accident there was always lots of snow on their side of the street. It was heaped up in the gutter along by the hydrant.

The plaintiff then rested, and the defendant proved that the department of water supply received a report that a hydrant was leaking in Fifty-Fifth street, between Broadway and Eighth avenue; that on February 1, 1905, a gang of men from the department of water supply started to stop the leak and to repair the street; that five men were engaged in the work; that the flagging around the hydrant was removed and the leak stopped; that they had to build a fire to thaw out the stones and the dirt, so that they could remove them to cut down where the leak was in the hydrant; that they made a hole from three to four feet wide and over four feet deep to where the water pipe was; that the fire softened the ground, and melted whatever snow there was around; that the excavation went 3 feet from the curb and 18 to 20 inches back of the hydrant, and the fire melted all the ice and snow adjoining the excavation; that, when they got through, there was no mound or ice 2½ feet from the hydrant at all; that, after they stopped the leak, they shoveled back all the dirt that had been excavated and pounded it down, and put the flagstone back again in its place.

From a consideration of all the evidence, I think it is conclusively established that the testimony of this boy Finck first given that the snow and ice had been removed from the sidewalk by the men engaged in repairing the hydrant; that the mound or lump of ice or snow upon which the plaintiff fell was reformed after these repairs were made was true; and that the change in his testimony upon the reassembling of the court after he had a consultation with the plaintiff's attorney was so improbable in itself and contradicted by all the other testimony upon the subject that any verdict based upon it was clearly against the weight of evidence. Any fire that would be sufficient to thaw out the ground to enable the men to make an excavation over 4 feet in depth would certainly have thawed the ice or snow within a distance of 2½ feet from the hydrant. The defendant then proved the

weather conditions that had existed in the city of New York during January and February. The repairs were made on the 1st and 2d of February. It was proved that in January 18 inches of snow and 2¾ inches of water fell, and that during the month the temperature had been below freezing, with but few exceptions.

From the 1st to the 13th of February the temperature was below 32 degrees except for a few hours in one or two days. On February 13th there was a considerable increase in temperature so that from 1 a. m., until noon, it was continuously above the freezing point, between 35 and 40 degrees. At noon the temperature commenced to fall until it reached 12 degrees at 12 o'clock at night. On February 14th the highest temperature was 18 degrees and the lowest 8 degrees above zero; the average for the day being 12.7 degrees. On February 15th the highest temperature was 25 degrees, the average for the day being 19.1 degrees. On February 16th the highest temperature was 21 degrees and the average 13.6 degrees. On February 17th the highest temperature was 33 degrees and the average 27.5 degrees. On February 13th the highest temperature was 28 degrees and the average 21.6 degrees. On February 19th, the day of the accident, the highest temperature was 30 degrees and the lowest 15 degrees; the average for the day being 22.9 degrees. Thus all of the month of February before the accident the temperature was below freezing with the exception of the 13th, when there was a thaw which lasted about 12 hours. It also appeared that on February 5th it commenced snowing at 9:30 p. m., and continued until 9:20 a. m. the next day, when two inches of snow fell. On February 9th it commenced to snow at 2:30 a. m., and continued until 3 p. m., and more snow fell during that night, so that three inches of snow fell during the 24 hours. On February 12th it commenced snowing at 2:30 p. m., and continued until 11 p. m., and at 12:30 on the 13th the snow commenced and continued for about two hours. Thus during all the month of February, after the repair of the hydrant, until the time of the accident, there was a succession of storms of snow with almost continued temperature considerably below freezing, but with a pronounced thaw which continued for about 12 hours 5 days before the accident. From this condition there resulted a pile of snow in the gutters and streets that extended up to and around the hydrant, which was near the curb and from which had resulted the condition of the sidewalk near the hydrant on the day of the accident upon which the plaintiff slipped and fell, and received injuries. Considering the weather conditions that had existed between the 1st and 19th of February, the question is then presented as to whether there was any neglect of the duty imposed upon the municipal corporation which resulted in this condition of the sidewalk. It is not claimed that the workmen engaged in repairing this hydrant had left any accumulation of dirt or snow upon the sidewalk. Those who did the work testified that the dirt removed to make the repairs was replaced in the excavation after the repairs were made, and that is not disputed.

There was introduced in the case a photograph which was taken two of three days after the accident and after a snowstorm had occurred

which commenced at 9 a. m. on the 20th and continued until 2 p. m., and during which time about three-fourths of an inch of snow fell. Cleaning the sidewalk of this snow might well have caused the mound of snow near the hydrant which appears in this photograph. Upon this evidence the parties rested, and, after all the testimony was in, the defendant moved to dismiss the complaint, and also moved for the direction of a verdict for the defendant on the ground that the evidence was not sufficient to show that the defendant was guilty of negligence. That motion was denied, and the defendant excepted. I think this motion should have been granted. In this climate during the winter months and after a period of severe and continuous snowstorms with a temperature most of the time below freezing, where the snow becomes packed on the sidewalks by the constant use of them by the pedestrians, it is manifestly impossible to keep the whole of the sidewalks clear of snow and the accumulations of ice. With the many miles of streets under the charge of the municipal corporation, to charge the city with such a duty would be to practically make the city liable for all accidents happening upon the streets caused by their slippery condition resulting from the snow and ice which fell and either became packed down or frozen after a thaw continuing during parts of the days when the temperature was at the highest. The city can, and does, by its ordinances require the owners of abutting property to clean the sidewalks of snow as it falls. Its only way of enforcing such ordinances is by imposing a penalty for their violation and enforcing that penalty in the event of a violation. It certainly is not the duty of the city after every snowstorm to cause workmen to clean all the sidewalks of the city so that they should be free of ice from the house line to the curb, as that is obviously impossible, and the law does not impose upon a municipal corporation an impossibility with a penalty of liability for an accident which has happened because the impossible was not performed. Where a fall of snow has been sufficient to cause an accumulation in the roadway higher than the sidewalk which is added to by the snow removed from the sidewalk, it is obviously impossible to prevent the snow from being thrown back on the sidewalk by passing vehicles and from being tramped down and frozen into compact masses near the curb; and, where the temperature remains below freezing, these masses of compact and frozen snow and ice are removed from the sidewalk with great difficulty. When such conditions are apparent, a person using the street is not justified in expecting to find the whole width of the sidewalk entirely free from such obstructions, and certainly the city of New York cannot be obliged to see to it that all such obstructions, especially those near the curb and away from the center of the sidewalk most used, have been removed.

That the law does not impose upon a municipal corporation a duty which would be impossible of performance has been constantly recognized. Thus in Lichtenstein v. Mayor, 159 N. Y. 500, 54 N. E. 67, the court said:

"If it [the municipal corporation] is bound to cart away all the snow that may fall within the limits of the street within a reasonable time, and not allow any ice or snow to accumulate either on the walks or on the roadway,

then it may be that there was a question in this case for the jury; but, if no such duty is imposed upon the city authorities, it is difficult to state any principle or reason upon which this judgment can be upheld. It is scarcely necessary to say that in the varying and uncertain winter climate of this state such a measure of diligence on the part of the city authorities would be unreasonable, since it would be impossible to comply with it. The accumulation of ice and snow in the streets of great cities is no doubt a very great inconvenience, but to hold the city liable for the result of every accident arising from such a condition would carry the rule of responsibility beyond all reasonable limits. The city would practically become an insurer of the individual against all injuries and mishaps in such times."

And Kaveny v. City of Troy, 108 N. Y. 571, 15 N. E. 726, is a case in its essential facts much like the case at bar, in which it was held that there was no evidence of negligence, and where the court said:

"Something more than the presence of ice due to the results of a low winter temperature must be shown to make the city chargeable with negligence. The fact that for more than 10 days preceding the accident to plaintiff the mercury had been below the freezing point was established without contradiction, and that the city did not accomplish impossibilities or display unreasonable and extraordinary diligence, furnishes no ground of liability."

In Taylor v. City of Yonkers, 105 N. Y. 202, 11 N. E. 642, 59 Am. Rep. 492, it was said in discussing the duty of a municipal corporation in regard to the sidewalks after a fall of snow:

"When the streets have been wholly or partially cleaned, it often happens that a fall of rain or the melting of adjoining snow is suddenly followed by severe cold which covers everything with a film or layer of ice and makes the walks slippery and dangerous. This frozen surface it is practically impossible to remove until a thaw comes which remedies the evil. The municipality is not negligent for awaiting that result. * * * The emergency is one which is common to every street in the village or city, and which the corporation is powerless to combat. Usually it lasts but a few days, and the corporate authorities may await without negligence a change of temperature which will remove the danger."

In Crawford v. City of New York, 68 App. Div. 107, 74 N. Y. Supp. 261, affirmed 174 N. Y. 518, 66 N. E. 1106, and Foley v. City of New York, 95 App. Div. 374, 88 N. Y. Supp. 690, we applied the principles settled by the authorities above cited and held the city not liable. In the case of Foley, supra, Mr. Justice McLaughlin thus stated the rule:

"In a great city like New York with its hundreds of miles of sidewalks, in a climate as changeable as it is there, it is not difficult to see that there are times when it is nearly, if not quite, impossible for it to keep its sidewalks entirely clear of snow and ice. In certain portions of the city, when a snowstorm occurs, the snow is quickly packed down by persons traveling upon the sidewalks, and, if the temperature is below the freezing point, ice soon forms and adheres to the walk, which renders the process of removal not only difficult, but many times attended with no little delay. It cannot be said to be negligent immediately following a fall of snow because it does not proceed at once to clear the sidewalks of snow and ice, because it is the duty of abutting property owners to do that work, and it has a right to rely for a reasonable time upon the assumption that they will perform the obligation which the law casts upon them."

Considering, therefore, the weather conditions which existed between the 1st and 19th of February, when this accident occurred, the conditions of the streets caused by the succession of snowstorms which occurred during that period, and the location of this particular obstruc-

tion upon which the plaintiff fell, near the curb and away from the center of the sidewalk which apparently was reasonably safe for passage, I do not think that there was evidence to justify a finding that the city was negligent.

The judgment should therefore be reversed and a new trial ordered, with costs to the appellant to abide the event.

CLARKE, J., concurs.

HOUGHTON, J., concurs on the ground that the verdict is against the weight of evidence as to accumulation of ice and snow having existed for sufficient length of time to charge the city with constructive notice.

McLAUGHLIN, J. (dissenting). On the 19th of February, 1905, the plaintiff sustained very serious injuries by slipping upon an accumulation of sand, ice, and snow upon the sidewalk. This accumulation was from six to eight inches in depth at the highest point, some two feet or more in length, and extended from a point near the curb line clear across the sidewalk. The proof at the trial justified the jury in finding that this accumulation had existed for nearly two months and was in substantially the same condition when the accident occurred that it was on the 25th of December preceding. At the conclusion of the trial there certainly was a question of fact for the jury as to how long the obstruction had existed, and their finding in favor of the plaintiff that it did in fact exist, and had existed for such length of time that the city was bound to remove it, cannot, I think, be said to be against the weight of evidence; but it is proposed to reverse the judgment solely upon that ground.

The fact that an obstruction had existed of substantially the character stated from about the 25th of December preceding to the 1st of February was not seriously disputed, but it is claimed that, when the hydrant referred to was repaired the 1st of February, a fire was built around it which melted and removed the obstruction on the sidewalk which had theretofore formed, and that the city was not liable for obstructions which thereafter formed by reason of the condition of the weather. The hydrant was repaired at the time stated in order to do which a fire had to be built around it, but the testimony is insufficient to sustain a finding that the obstruction upon the walk was removed by it, or that it did not remain in substantially the same condition, after repairs, that it was before. The photograph in the record shows the obstruction, and the plaintiff's witnesses Finck and Florence Meyer testify, not only as to its correctness at the time the accident occurred, but also that the obstruction then was in substantially the same condition that it had been for several weeks. Finck was employed in a building only a few feet away. He noticed the obstruction from day to day, and some time prior to the accident heard a policeman's attention called to it and a request made that it be removed. The witness Meyer also noticed it every day for several weeks prior to the accident. Finck also saw the repairs which were made to the hydrant, and testified that the only flagging which was

removed was the one placed around the hydrant, and in this he was corroborated by at least four witnesses produced by the defendant. The hydrant was located 10 inches from the curbstone. To me it seems incredible that a small fire built around the hydrant, with the temperature as low as that stated in the prevailing opinion, could have removed the obstruction upon the walk; but whether it could or not was a question for the jury.

That the plaintiff was seriously injured by an obstruction upon the walk is not disputed. How long the obstruction had existed is not shown, except by the plaintiff's witnesses, two of whom (and they were disinterested) stated that the same had existed for several weeks and a portion of that time the temperature was such that the same could easily have been removed. The credibility of these witnesses was for the jury, and I do not see how it can be said its verdict is against the weight of evidence, and especially when they both are corroborated in some respects by some of the defendant's witnesses.

For these reasons, I think the judgment appealed from should be affirmed.

PATTERSON, P. J., concurs.